# UNCONSTITUTIONAL RESTRICTIONS ON ACTIVITIES OF THE OFFICE OF SCIENCE AND TECHNOLOGY POLICY IN SECTION 1340(A) OF THE DEPARTMENT OF DEFENSE AND FULL-YEAR CONTINUING APPROPRIATIONS ACT, 2011

*Section 1340(a) of the Department of Defense and Full-Year Continuing Appropriations Act, 2011 is unconstitutional as applied to certain activities undertaken pursuant to the President's constitutional authority to conduct the foreign relations of the United States.*

*Most, if not all, of the activities of the Office of Science and Technology Policy that we have been asked to consider fall within the President's exclusive power to conduct diplomacy, and OSTP's officers and employees therefore may engage in those activities as agents designated by the President for the conduct of diplomacy, notwithstanding section 1340(a).*

*The plain terms of section 1340(a) do not apply to OSTP's use of funds to perform its functions as a member of the Committee on Foreign Investment in the United States.*

September 19, 2011

## MEMORANDUM OPINION FOR THE GENERAL COUNSEL, OFFICE OF SCIENCE AND TECHNOLOGY POLICY

This memorandum confirms and elaborates upon advice this Office provided to you regarding the permissibility of certain activities of the Office of Science and Technology Policy ("OSTP") involving Chinese officials, organizations, and experts, in light of section 1340(a) of the Department of Defense and Full-Year Continuing Appropriations Act, 2011, Pub. L. No. 112-10, 125 Stat. 38, 123 ("Continuing Appropriations Act"). Section 1340(a) purports to prevent OSTP from using appropriated funds "to develop, design, plan, promulgate, implement, or execute a bilateral policy, program, order, or contract of any kind to participate, collaborate, or coordinate bilaterally in any way with China or any Chinese-owned company." In our view, section 1340(a) is unconstitutional as applied to certain activities undertaken pursuant to the President's constitutional authority to conduct the foreign relations of the United States. Most, if not all, of the activities you have described to us fall within the President's exclusive power to conduct diplomacy, and OSTP's officers and employees therefore may engage in those activities as agents designated by the President for the conduct of diplomacy with the People's Republic of China ("China" or "PRC"), notwithstanding section 1340(a). We also believe that the plain terms of section 1340(a) do not apply to OSTP's use of funds to perform its functions as a member of the Committee on Foreign Investment in the United States, even though those functions include reviewing proposed asset purchases in the United States by Chinese businesses and institutions.

### I.

Congress established OSTP in 1976 within the Executive Office of the President to "serve as a source of scientific and technological analysis and judgment for the President with respect to major policies, plans, and programs of the Federal Government." 42 U.S.C. §§ 6611, 6614(a) (2006). The Office is headed by a Director, whose "primary function" is "to provide . . . advice on the scientific, engineering, and technological aspects of issues that require attention at

the highest levels of Government." *Id.* §§ 6611, 6613(a) (2006). The Director's statutory responsibilities also include "defin[ing] coherent approaches for applying science and technology to critical and emerging national and international problems"; "assess[ing] and advis[ing] on policies for international cooperation in science and technology which will advance the national and international objectives of the United States"; "advis[ing] the President of scientific and technological considerations involved in areas of national concern including, but not limited to, the economy, national security, homeland security, health, foreign relations, the environment, and the technological recovery and use of resources"; and "perform[ing] such other duties and functions . . . as the President may request." *Id.* §§ 6613(b)(1), 6614(a)(1), (9), (13) (2006).

In 1979, the United States and the People's Republic of China entered into an executive agreement on cooperation in science and technology. Intended "to provide broad opportunities for cooperation in scientific and technological fields of mutual interest," this agreement and subsequent protocols obligate the two contracting parties to "encourage and facilitate, as appropriate, the development of contacts and cooperation between government agencies, universities, organizations, institutions, and other entities of both countries, and the conclusion of accords between such bodies for the conduct of cooperative activities." Agreement Between the Government of the United States of America and the Government of the People's Republic of China on Cooperation in Science and Technology, U.S.-China, art. 1, 4, Jan. 31, 1979, 30 U.S.T. 35 ("1979 Agreement"). The 1979 Agreement authorizes the United States and China to enter into subsequent accords to implement its terms, including accords to promote further cooperation and address "intellectual property, funding and other appropriate matters." *Id.* art. 5. The 1979 Agreement also specifies that the United States and China "shall establish a US-PRC Joint Commission on Scientific and Technological Cooperation," which "shall plan and coordinate cooperation in science and technology, and monitor and facilitate such cooperation." *Id.* art. 10.

Under the agreement, each contracting party must "designate an Executive Agent" with responsibility "for coordinating the implementation of its side of [all covered] activities and programs." *Id.* The agreement stipulates that the agent of the United States "shall be the Office of Science and Technology Policy." *Id.* Although the 1979 Agreement originally provided that it would remain in force for only five years, it also provided for extension by mutual agreement of the contracting parties, *id.* art. 11; and, in fact, the United States and China have repeatedly agreed to extensions. Most recently, in a January 19, 2011 protocol (signed for the United States by the Director of OSTP), the contracting parties extended the agreement until April 2016. Protocol Extending the Agreement Between the Government of the United States of America and the Government of the People's Republic of China on Cooperation in Science and Technology, U.S.-China, Jan. 19, 2011; *see also, e.g.*, Protocol Extending the Agreement Between the Government of the United States of America and the Government of the People's Republic of China on Cooperation in Science and Technology, U.S.-China, Apr. 18, 2006, Temp. State Dep't No. 06-112, 2006 WL 2620339.

Since 1979, OSTP's officers and employees have had extensive contact and engagement with their Chinese counterparts, as contemplated by the agreement. The Joint Commission on Scientific and Technological Cooperation ("Joint Commission") established by the 1979 Agreement meets biannually to coordinate and manage the collaborative science and technology activities of the U.S. and Chinese governments. Letter for the Office of Legal Counsel, Department of Justice, from Rachael Leonard, General Counsel, Office of Science and

Technology Policy at 2 (June 2, 2011) ("Leonard Letter"). We understand that the Joint Commission now manages numerous protocols, memoranda of understanding, and other cooperative agreements or undertakings between U.S. agencies and Chinese government entities. *Id.* at 3. These accords address subjects such as agriculture, energy, health, the environment, earth sciences, marine research, and nuclear safety. *Id.* In addition, we understand that, in 2010, a U.S.-China Dialogue on Innovation Policy ("Innovation Policy Dialogue") was established as an activity of the Joint Commission. *Id.* The Innovation Policy Dialogue is a forum for sharing best practices in promoting innovation, entrepreneurship, and mutually beneficial technology activities and for identifying, analyzing, and overcoming barriers to innovation associated with the two countries' policies. *Id.*

In recent appropriations legislation, Congress sought to restrict OSTP's interactions with and activities involving China. Section 1340 of the Continuing Appropriations Act, enacted on April 15, 2011, provides in full:

> (a) None of the funds made available by this division may be used for the National Aeronautics and Space Administration or the Office of Science and Technology Policy to develop, design, plan, promulgate, implement, or execute a bilateral policy, program, order, or contract of any kind to participate, collaborate, or coordinate bilaterally in any way with China or any Chinese-owned company unless such activities are specifically authorized by a law enacted after the date of enactment of this division.
>
> (b) The limitation in subsection (a) shall also apply to any funds used to effectuate the hosting of official Chinese visitors at facilities belonging to or utilized by the National Aeronautics and Space Administration.

125 Stat. at 123. You asked us, in light of this provision, whether and to what extent OSTP may engage in activities related to the Joint Commission and the Innovation Policy Dialogue, as well as other interactions with representatives of the Chinese government. Leonard Letter at 7-8.

## II.

To the extent that funding conditions such as those set out in section 1340(a) bar the President from conducting international diplomacy through his chosen agents, they unconstitutionally interfere with the President's foreign affairs powers and may be disregarded by Executive Branch agencies.

### A.

As "the constitutional representative of the United States in its dealings with foreign nations," *United States v. Louisiana*, 363 U.S. 1, 35 (1960), the President has "unique responsibility" for the conduct of "foreign . . . affairs." *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 188 (1993); *see also, e.g.*, *First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 767 (1972) (noting "the lead role of the Executive in foreign policy"). One well-established component of the President's foreign affairs power is the "basic authority to conduct the Nation's diplomatic relations." Memorandum for Joan E. Donoghue, Acting Legal Adviser, Department

of State, from David J. Barron, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Constitutionality of Section 7054 of the Fiscal Year 2009 Department of State, Foreign Operations, and Related Programs Appropriations Act* at 4 (June 1, 2009) ("Section 7054 Opinion"), *available at* www.justice.gov/olc/opinions.htm. To be sure, Congress "clearly possesses significant article I powers in the area of foreign affairs, including with respect to questions of war and neutrality, commerce and trade with other nations, foreign aid, and immigration," *id.* at 4; and Congress's exercise of those powers has sometimes limited the President's options in implementing foreign policy, *id.* at 9-10. But, "[i]n the conduct of negotiations with foreign governments, it is imperative that the United States speak with one voice. The Constitution provides that that one voice is the President's." *Issues Raised by Foreign Relations Authorization Bill*, 14 Op. O.L.C. 37, 40 (1990) ("*Foreign Relations Authorization Bill*") (quoting *Message to the Senate Returning Without Approval the Bill Prohibiting the Export of Technology for the Joint Japan-United States Development of FS-X Aircraft*, 2 Pub. Papers of George H.W. Bush 1042, 1043 (July 31, 1989)).

The President's exclusive prerogatives in conducting the Nation's diplomatic relations are grounded in both the Constitution's system for the formulation of foreign policy, including the presidential powers set forth in Article II of the Constitution,[1] and in the President's acknowledged preeminent role in the realm of foreign relations throughout the Nation's history. *See, e.g.*, *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) ("the historical gloss on the 'executive Power' vested in Article II of the Constitution has recognized the President's 'vast share of responsibility for the conduct of our foreign relations'" (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610-11 (1952) (Frankfurter, J., concurring))).[2] This core presidential power over the conduct of diplomacy includes the "exclusive authority to determine the time, scope, and objectives" of international negotiations and the individuals who will represent the United States in those contexts. Section 7054 Opinion at 8 & nn.9-10 (internal quotation marks omitted) (collecting authorities); *see also, e.g.*, *Section 235A of the Immigration and Nationality Act*, 24 Op. O.L.C. 276, 281 (2000) (describing statute as "impermissibly specify[ing] the precise subject matter of the Executive's communications with foreign governments"). As one President observed in a veto message addressing a legislative provision he determined could impede U.S. consultations with other nations:

> It has . . . long been recognized—by the Framers, by the Supreme Court, and by past Congresses—that the President, both personally and through his subordinates in the executive branch, possesses the constitutional authority to communicate freely with representatives of foreign governments, and to encourage foreign nations to take such actions as the President believes are in our Nation's interest.

---

[1] *See* U.S. Const. art. II, § 1, cl. 1 (vesting "[t]he executive Power" in the President); *id.* art. II, § 2, cl. 2 (enumerating the President's powers to "make Treaties," and "appoint Ambassadors . . . and Consuls"); *id.* art. II, § 3 (establishing President's authority to "receive Ambassadors and other public Ministers").

[2] *See generally* Section 7054 Opinion at 5-7 (discussing longstanding Executive Branch practice and early congressional precedents regarding the President's foreign affairs powers); *Foreign Relations Authorization Bill*, 14 Op. O.L.C. at 39-41 (discussing historical examples showing that "the courts, the Executive, and Congress have all concurred that the President's constitutional authority specifically includes the exclusive authority to represent the United States abroad").

*Message to the House of Representatives Returning Without Approval the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1990*, 25 Weekly Comp. Pres. Doc. 1783, 1784 (Nov. 19, 1989) ("*1990 Foreign Operations Appropriations Veto Message*"); *see also Message to the House of Representatives Returning Without Approval the Foreign Relations Authorization Act, Fiscal Years 1990 and 1991*, 25 Weekly Comp. Pres. Doc. 1806, 1806 (Nov. 21, 1989) (repeating same statement in veto message addressing similar provision in another bill).

We have described the President's authority over "international negotiations" as extending to "any subject that has bearing on the national interest." *The President—Authority to Participate in International Negotiations*, 2 Op. O.L.C. 227, 228 (1978) ("*Authority to Participate in International Negotiations*"). The Executive Branch has treated widely varied subject matters as falling within the President's exclusive authority over diplomacy, including discussion with foreign governments of international fishing restrictions, inquiries regarding the status of certain Israeli soldiers missing in action, and requests by the United States for "covert action" by a foreign government or private party.[3] We also have deemed legislative restrictions on the President's conduct of diplomacy impermissible even when they did not purport to limit discussion of any particular subjects, but rather barred participation by Executive Branch officials in certain international exchanges. *See, e.g.*, Section 7054 Opinion at 1; *Issues Raised by Provisions Directing Issuance of Official or Diplomatic Passports*, 16 Op. O.L.C. 18, 25-26 (1992) ("*Issuance of Official or Diplomatic Passports*").

The President's power over the conduct of diplomacy also includes exclusive authority "to determine the individuals who will represent the United States in those diplomatic exchanges." Section 7054 Opinion at 8 (footnote and internal quotation marks omitted). As we have recently explained, "ample precedent" demonstrates that Congress may not constitutionally "dictate the modes and means by which the President engages in international diplomacy," and "[s]pecifically[] . . . may not . . . place limits on the President's use of his preferred agents to engage in a category of important diplomatic relations." *Id.* at 4, 5. We thus deemed unconstitutional a provision that "effectively denie[d] the President the use of his preferred agents—representatives of the State Department—to participate in delegations to specified U.N. entities chaired or presided over by certain countries." *Id.* at 4.

The President also has plenary and exclusive authority to *receive* diplomatic representatives of foreign governments, by virtue of his specific constitutional authority to "receive Ambassadors and other public Ministers." U.S. Const. art. II, § 3. As the Attorney General noted over a century and a half ago, the President's "right of reception extends to 'all possible diplomatic agents which any foreign power may accredit to the United States.'" *Presidential Power Concerning Diplomatic Agents and Staff of the Iranian Mission*, 4A Op. O.L.C. 174, 180 (1980) (quoting *Ambassadors and Other Public Ministers of the United States*,

---

[3] *See Statement on Signing the Sustainable Fisheries Act*, 32 Weekly Comp. Pres. Doc. 2040, 2041 (Oct. 11, 1996); *Statement on Signing Legislation to Locate and Secure the Return of Zachary Baumel, a United States Citizen, and Other Israeli Soldiers Missing in Action*, 35 Weekly Comp. Pres. Doc. 2305, 2305 (Nov. 8, 1999); *Memorandum of Disapproval for the Intelligence Authorization Act, Fiscal Year 1991*, 26 Weekly Comp. Pres. Doc. 1958, 1958 (Nov. 30, 1990).

7 Op. Atty. Gen. 186, 209 (1855)).[4]  Presidents therefore have regularly objected to legislation purporting to bar their interaction with particular foreign officials.[5]

Finally, we believe the President's constitutional prerogatives to engage in international negotiations and discussions through his preferred agents and to receive diplomatic agents from abroad also prevent congressional interference with the participation by the President and his agents in the activities, functions, and preparatory work necessary to carry out meaningful diplomatic interaction with foreign officials.  Without the authority to prepare and perform other necessary related tasks, the diplomatic activities of the President and his agents would be unduly constrained or foreclosed.  *Cf. Issuance of Official or Diplomatic Passports*, 16 Op. O.L.C. at 21-22, 25-27 (concluding that a legislative provision was invalid insofar as it barred the issuance of multiple official diplomatic passports to U.S. officials, because that practice facilitated diplomacy and flowed from the Executive's authority "to determine the form and manner in which the United States will maintain relations with foreign nations"); *Bill to Relocate United States Embassy from Tel Aviv to Jerusalem*, 19 Op. O.L.C. 123, 125 (1995) ("*Bill to Relocate U.S. Embassy*") ("Congress may not impose on the President its own foreign policy judgments as to the particular sites at which the United States' diplomatic relations are to take place," because "the venue at which diplomatic relations occur is itself often diplomatically significant").

**B.**

We turn now to the application of these principles to section 1340.  Initially, we note that the fact that section 1340 is an appropriations restriction, rather than a direct prohibition of conduct, does not affect our analysis of whether the particular limits that section 1340 places on OSTP's activities are constitutional.  As we explained in our Section 7054 Opinion, Congress may use its spending power to decline to appropriate money or place conditions on its appropriations.  Section 7054 Opinion at 10-11 (footnote omitted).  Congress may not, however, "'use the appropriations power to control a Presidential power that is beyond its direct control'" or to "invade core Presidential prerogatives in the conduct of diplomacy."  *Id.* at 11-12 (quoting *Presidential Certification Regarding the Provision of Documents to the House of*

---

[4] *See also, e.g.*, *Constitutionality of Closing the Palestine Information Office, an Affiliate of the Palestine Liberation Organization*, 11 Op. O.L.C. 104, 122 (1987) ("The right to decide whether to accord to the [Palestine Liberation Organization] diplomatic status and what that diplomatic status should be is encompassed within the right of the President to receive ambassadors.  U.S. Const. art. II, § 3.  This power is textually committed to the Executive alone.").

[5] *See, e.g.*, *Statement on Signing the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996*, 32 Weekly Comp. Pres. Doc. 479, 479 (Mar. 12, 1996) (observing that "[a] categorical prohibition on the entry of [certain individuals who confiscate or traffic in expropriated property] could constrain the exercise of my exclusive authority under Article II of the Constitution to receive ambassadors and to conduct diplomacy"); *Statement on Signing the Foreign Relations Authorization Act, Fiscal Years 1990 and 1991*, 26 Weekly Comp. Pres. Doc. 266, 267 (Feb. 16, 1990) (objecting on constitutional grounds to provisions restricting expenditure of funds for discussion with representatives of the Palestine Liberation Organization whom the President knew to be directly involved in terrorist activity and purporting to bar admission to the United States of foreign representatives to the United Nations who had been found to have engaged in certain espionage activities directed against the United States or its allies); *cf. Statement on Signing H.R. 1777 Into Law*, 23 Weekly Comp. Pres. Doc. 1547, 1548 (Dec. 22, 1987) (concluding that prohibition on "establishment anywhere within the jurisdiction of the United States of an office 'to further the interests of' the Palestine Liberation Organization" created "no actual constitutional conflict" only because the President had "no intention of establishing diplomatic relations with the PLO").

*Representatives Under the Mexican Debt Disclosure Act of 1995*, 20 Op. O.L.C. 253, 267 (1996)) (citation and internal quotation marks omitted).[6] At least insofar as it has otherwise appropriated funds,[7] Congress may not impair the President's conduct of foreign affairs by imposing restrictions on expenditures that serve diplomatic purposes.

Applying the general legal principles and conclusions outlined in Part II.A. to the particular facts presented here, we conclude that OSTP may engage in most, if not all, of the activities you have described, notwithstanding section 1340(a). As a general matter, discussions of the sort identified in your request—meetings and exchanges with Chinese officials regarding policy concerns and possible cooperative undertakings or agreements relating to science and technology—fall squarely within the scope of the President's constitutional authority to engage in discussions with foreign governments. Such matters undoubtedly have a significant "bearing on the national interest." *Authority to Participate in International Negotiations*, 2 Op. O.L.C. at 228. Indeed, in an indication of the significance of these matters for U.S. relations with China, the State Department has informally advised us that the U.S. Embassy in Beijing includes multiple officials, recognized as diplomatic agents by the Chinese government, who work principally on facilitating cooperative activities with China on science and technology matters. *Cf.* Vienna Convention on Diplomatic Relations art. 3, Apr. 18, 1961, 23 U.S.T. 3227 (entered into force with respect to the United States Dec. 13, 1972) (identifying "developing . . . economic, cultural, and scientific relations" as a function of a diplomatic mission).

In light of the diplomatic character of such activities, it is equally clear that the President has exclusive constitutional authority to choose the agents who will engage in the activities. *See, e.g.*, Section 7054 Opinion at 8. That authority provides him with absolute discretion to choose whomever he considers most suitable for a particular purpose. The circumstances here, in fact, illustrate the practical importance of this presidential prerogative. OSTP, as noted, is the designated "Executive Agent" of the United States for exchanges with China on science and technology matters under a longstanding international agreement. But the current Director of OSTP, Dr. John P. Holdren, is also an accomplished scientist with a distinguished résumé who serves as the Assistant to the President for Science and Technology. In addition to any background knowledge, scientific expertise, and personal relationships Dr. Holdren may bring to bear in particular diplomatic exchanges, it would be reasonable for the President to conclude that the prestige associated with Dr. Holdren's official titles and qualifications may assist the United States in achieving its diplomatic goals. Accordingly, barring Dr. Holdren's participation in

---

[6] *See also, e.g.*, *Section 609 of the FY 1996 Omnibus Appropriations Act*, 20 Op. O.L.C. 189, 197 (1996) ("it has long been established that the spending power may not be deployed to invade core Presidential prerogatives in the conduct of diplomacy"); *Placing of United States Forces Under United Nations Operational or Tactical Control*, 20 Op. O.L.C. 182, 187-88 (1996) ("That Congress has chosen to invade the President's authority indirectly, through a condition on an appropriation, rather than through a direct mandate, is immaterial."); *Bill to Relocate U.S. Embassy*, 19 Op. O.L.C. at 126 ("it does not matter in this instance that Congress has sought to achieve its objectives through the exercise of its spending power, because the condition it would impose on obligating appropriations is unconstitutional"); *Foreign Relations Authorization Bill*, 14 Op. O.L.C. at 44 ("the President may enforce the remainder of the provision, disregarding" an unconstitutional funding condition).

[7] We have been asked only to address the effect of section 1340(a) and therefore presume, for purposes of this opinion, that the expenditures were otherwise authorized. We need not and do not address the legality or propriety of OSTP's expenditures under governing appropriations provisions apart from section 1340(a).

diplomatic exchanges could severely impair the achievement of those goals by denying to the President one important means of signaling the priority the United States attaches to science and technology policy in its international relationships.

Our answers to your specific questions are as follows:  You asked, first, whether Dr. Holdren may continue to serve as co-chair of the Joint Commission and the Innovation Policy Dialogue, and also whether he may represent the work of the Innovation Policy Dialogue in a broader diplomatic forum known as the U.S.-China Strategic and Economic Dialogue ("S&ED Dialogue").  You have described the Joint Commission as "the main body that facilitates science and technology cooperation under the [1979] bilateral agreement."  Leonard Letter at 2.  The Joint Commission "oversees, implements, and promotes expansion of [science and technology] cooperation with China in areas of mutual benefit to the two countries." *Id.*  You have described the Innovation Policy Dialogue as a forum for "shar[ing] best practices in promoting innovation, entrepreneurship, and mutually beneficial joint activities in high technology" and "especially" for "identify[ing], analyz[ing], and overcom[ing] barriers to innovation and associated trade and business activities that may be associated with innovation policies, intellectual-property rights . . . policies, trade policies, etc., on either side." *Id.* at 3-4.

Based on your descriptions, we believe that most, if not all, activity associated with the Director of OSTP's participation in these activities would involve either diplomatic discussion of the two countries' policies, or the formation and refinement of international agreements and other cooperative undertakings between the United States and China.  The Joint Commission, the Innovation Dialogue, and the S&ED Dialogue also all involve efforts to encourage China "to take such actions as the President believes are in our Nation's interest." *1990 Foreign Operations Appropriations Veto Message*, 25 Weekly Comp. Pres. Doc. at 1783.  These efforts implicate the President's exclusive authority to determine the time, scope, and objectives of discussions with China, as well as his exclusive authority to select the agent he prefers as the representative of the United States in these discussions.

You also asked whether the Director of OSTP may "meet with Chinese officials and technical experts on . . . issues, like the ongoing nuclear crisis in Japan, to discuss ways in which the U.S. and China might work together on these topics."  Leonard Letter at 8.  Again, we conclude that such meetings to discuss possible joint responses to an international crisis and other possible "ways [the two countries] might work together" constitute quintessential diplomatic activities and exchanges over which the President has exclusive authority.

Other activities you describe that support or facilitate exchanges between U.S. and Chinese officials to discuss matters of mutual and ongoing concern also fall within the Executive's exclusive power to conduct diplomacy.  We include in this category expenditures for:  the Director of OSTP's work in preparation for Joint Commission and Innovation Policy Dialogue meetings and presentations to the S&ED Dialogue; staff support work necessary to prepare for and participate in such meetings and activities; associated travel and lodging expenses, translation services, meeting room fees, and use of audiovisual equipment; and other administrative support services. *See id.* at 7-8.  Such expenditures for preparation, support, and facilitation of diplomatic discussion fall within the President's exclusive authority when they are necessary to carry out meaningful diplomatic initiatives.  Accordingly, at least insofar as Congress has appropriated funds for agency staff work and expenses generally, section 1340(a)

may not constrain the use of those funds for expenditures necessary to support diplomatic activities. *Cf. Issuance of Official or Diplomatic Passports*, 16 Op. O.L.C. at 25-27 (deeming unconstitutional an appropriations rider that barred use of funds for issuance of multiple official passports to diplomats who would be denied entry to certain Arab League states and thus be unable to represent the United States in important diplomatic exchanges if they used a passport showing prior travel to Israel); *Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 435 (1990) (White, J., concurring) (rejecting view "that Congress could impair the President's pardon power by denying him appropriations for pen and paper").

We also would include in this category the support activities for the "experts-level working group" associated with the Innovation Policy Dialogue. Your submission to us indicates that there is "[a]ssociated with the ministerial level [Dialogue on Innovation Policy] . . . an experts-level working group that is addressing a variety of key technical issues, including 'on the ground' monitoring of whether commitments are being observed in practice." Leonard Letter at 3. You have asked whether OSTP employees may "support the experts-level working group (made up of non-government officials from American and Chinese businesses and universities) in their role of providing information and advice on barriers to the successful fulfillment of bi-lateral agreements," and whether OSTP may "make recommendations to the co-chairs of the Innovation Dialogue regarding policies that will enhance market access for US companies." *Id.* at 8. To the extent that the OSTP employees are supporting activities of the experts-level working group that provide policymakers with information and analysis needed to facilitate dialogue with Chinese officials, or the formulation of joint policy initiatives, the activities of OSTP employees would be facilitating diplomacy and would fall within the President's exclusive constitutional authority over diplomatic relations. Likewise, OSTP employee activity necessary to "mak[ing] recommendations" to diplomatic negotiators on particular policy options facilitates diplomatic negotiations and would fall within the President's exclusive authority.

Finally, you asked whether OSTP may provide "small gifts" and meals for visiting Chinese delegations. We believe that, to the extent Congress has appropriated funds to OSTP for such purposes generally,[8] OSTP's decision to use those funds to provide small gifts and meals to particular foreign officials falls within the Executive's exclusive constitutional prerogatives. Congress may not impose restrictions on the funds it has appropriated that would interfere with the President's conduct of diplomacy. Participation in social interactions with foreign officials, exchanges of customary gifts, and the extension of the courtesies associated with diplomatic meetings can constitute an expected element of international diplomacy and may be necessary to facilitate diplomatic exchange or to repay hospitality afforded to U.S. delegations by the Chinese government. The President could reasonably conclude that the failure of the United States to engage in these activities would harm the standing and influence of the United States and therefore impair our ability to achieve diplomatic objectives.[9] Congress itself has recognized the diplomatic significance of these types of expenditures by specifically authorizing many agencies, including OSTP, to expend funds for "official reception and representation,"

---

[8] As noted above, *see supra* n. 7, we assume for purposes of this opinion that appropriated funds are available in general for the purposes you have described; we address only the effect of section 1340(a) on such appropriations.

[9] *Cf.* Section 7054 Opinion at 10 (objecting to restrictions on U.S. delegations to the United Nations on the ground that failure to send such delegations would compromise the "standing and influence" of the United States).

a practice that "originated," according to the Comptroller General, "from the need to permit officials of agencies with significant presence in foreign countries to reciprocate courtesies extended to them by foreign officials." *Matter of: United States Trade Representative—Use of Reception and Representation Funds*, B-223678, 1989 WL 240750, at \*4 n.2 (Comp. Gen. June 5, 1989).[10]

Though we have concluded that section 1340(a) is unconstitutional in the many applications we have discussed, the provision is constitutional in some other applications. For example, its broad terms—restricting any use of funds "to develop, design, plan, promulgate, implement, or execute a bilateral policy, program, order, or contract of any kind to participate, collaborate, or coordinate bilaterally in any way with China or any Chinese-owned company"— may well bar expenditures for activities that are neither diplomatic in character nor otherwise within the exclusive constitutional authority of the President. Congress may restrict the implementation of previously negotiated agreements, insofar as such restrictions do not interfere with activity that is itself diplomatic. Congress may also "modify the domestic legal effects" of an agreement, even if doing so has repercussions for the United States on the international stage. *See, e.g.*, *Validity of Congressional-Executive Agreements that Substantially Modify the United States' Obligations Under an Existing Treaty*, 20 Op. O.L.C. 389, 389 (1996) (noting the well-established nature of this congressional power).[11] Thus, whether Congress may validly prevent Dr. Holdren from performing work "required to . . . follow up" on meetings of the Joint Commission and Innovation Policy Dialogue—another type of activity you inquired about—may depend on the nature of the follow-up work.

To provide a concrete illustration, Congress could decline to appropriate funds for OSTP participation in a conference bringing together the U.S. business community to determine how to meet energy efficiency benchmarks, even if those benchmarks were articulated in agreements negotiated between OSTP and China. On the other hand, Congress may not bar follow up work after Joint Commission or Innovation Policy Dialogue meetings that is itself diplomatic in character or necessary to the effective conduct of diplomacy, including efforts to evaluate an

---

[10] Congress appropriated funds for OSTP most recently in the Continuing Appropriations Act, div. B, tit. I, § 1101(a)(6), 125 Stat. at 103, which carried forward appropriations levels from the Consolidated Appropriations Act, 2010, Pub. L. No. 111-117, tit. III, 123 Stat. 3034, 3142 (2009). The latter statute appropriated funds "not to exceed $2,500 for official reception and representation expenses" of OSTP. *Id.* A permanent authorization statute for the State Department similarly recognizes that expenditures for "official receptions" and other "entertainment and representational expenses" may be necessary "for the proper representation of the United States and its interests." 22 U.S.C. § 4085; *see also* U.S. General Accounting Office, GAO-04-261SP, *Principles of Federal Appropriations Law*, vol. I, at 4-135 (3d ed. 2004) ("the State Department would find it difficult to accomplish its mission if it could not spend any money entertaining foreign officials"); *cf. The President—Interpretation of 18 U.S.C. § 603 as Applicable to Activities in the White House*, 3 Op. O.L.C. 31, 42 (1979) (noting, in connection with interpreting a particular statute, that "[p]articipation in ceremonial dinners and attendance at other gatherings in furtherance of the conduct of the President's constitutional duties," including "entertainment of foreign dignitaries," are "ordinarily regarded as essential parts of the President's job").

[11] *See also, e.g.*, *Breard v. Greene*, 523 U.S. 371, 376 (1998) ("'an Act of Congress . . . is on a full parity with a treaty, and . . . when a statute which is subsequent in time is inconsistent with a treaty, the statute to the extent of the conflict renders the treaty null'" (quoting *Reid v. Covert*, 354 U.S. 1, 18 (1957) (plurality opinion)) (first ellipsis in original)); *La Abra Silver Mining Co. v. United States*, 175 U.S. 423, 460 (1899) ("Congress by legislation, and so far as the people and authorities of the United States are concerned, could abrogate a treaty made between this country and another country which had been negotiated by the President and approved by the Senate").

agreement's effectiveness in order to determine how best to proceed in future diplomatic discussions. As you have explained, "[t]he negotiation of a new agreement or modification of an existing agreement often requires knowledge of the implementation history of current agreements." Leonard Letter at 8.

In sum, at least insofar as Congress has otherwise appropriated funds to OSTP, Congress may not impair the President's conduct of foreign affairs through restrictions targeted at OSTP expenditures for diplomatic purposes. In many instances, therefore, the restrictions that section 1340 imposes are unconstitutional. But, given that section 1340 is likely constitutional in certain applications, the appropriate course of action is to treat the unconstitutional applications of section 1340(a) as effectively severed.[12] *See Foreign Relations Authorization Bill*, 14 Op. O.L.C. at 44-45 ("A presumption in favor of the severability of unconstitutional provisions exists so long as what remains of the statute is capable of functioning independently.") (collecting cases). Moreover, there is no reason to believe that the Continuing Appropriations Act "will not function in a *manner* consistent with the intent of Congress" if the unconstitutional applications of section 1340(a) are severed.[13] Section 7054 Opinion at 12 n.18 (internal quotation marks omitted). The Continuing Appropriations Act, of which section 1340 is a part, as well as section 1340 itself, may continue to be applied as if the Act did not include the unconstitutional funding restrictions. *See id.*

### III.

You have also asked whether, under section 1340(a), OSTP may continue to participate in the Committee on Foreign Investment in the United States ("CFIUS"), a federal Government entity that reviews certain transactions that have national security implications. *See* 50 U.S.C. App. § 2170 (2006 & Supp. III 2009); Exec. Order No. 11858, *reprinted as amended in* 50 U.S.C. App. § 2170 app. at 823-25. We conclude that section 1340(a) is best understood not to restrict OSTP's participation in CFIUS.

CFIUS is composed of the heads of federal agencies and offices specified by statute and executive order, one of which is OSTP. 50 U.S.C.A. App. § 2170(k); Exec. Order No. 11858

---

[12] The general rule that unconstitutional provisions in Acts of Congress should be severed, leaving the remainder of the Act in question valid and in place, applies equally to situations in which only certain *applications* of a provision would be unconstitutional. *See generally United States v. Booker*, 543 U.S. 220, 247 (2005) ("[S]ometimes severability questions (questions as to how, or whether, Congress would intend a statute to apply) . . . arise when a legislatively unforeseen constitutional problem requires modification of a statutory provision as applied in a significant number of instances . . . . [S]everability questions can arise from unconstitutional applications of statutes." (citation and internal quotation marks omitted)).

[13] To the contrary, although the chairman of the House appropriations subcommittee with jurisdiction over OSTP noted in a floor statement that the appropriations bill included "language prohibiting NASA and the Office of Science and Technology in the White House from participating in bilateral cooperation with China," 157 Cong. Rec. H2741 (daily ed. Apr. 14, 2011) (statement of Rep. Wolf), statements by this same Representative and other Members of Congress emphasized the bill's overriding purpose of establishing appropriations levels for the federal Government as a whole, including OSTP, for the remainder of the fiscal year. *See, e.g.*, *id.* (expressing "very strong support" for the bill and noting that it "preserves strong funding levels for critical national priorities"); 157 Cong. Rec. H2742 (daily ed. Apr. 14, 2011) (statement by Rep. Fattah, ranking member of same appropriations subcommittee) ("[i]n our section of this bill . . . it's very, very important that we get out of the temporary [continuing resolution] business").

§ 3, *reprinted as amended in* 50 U.S.C. App. § 2170 app. at 824.  CFIUS reviews certain transactions "by or with any foreign person which could result in foreign control [as defined in applicable regulations] of any person engaged in interstate commerce in the United States." 50 U.S.C. App. § 2170(a)(2), (3), (b); *see also* 31 C.F.R. § 800-204 (2010) (defining "control"); *id.* §§ 800.301-800.303 (discussing scope of covered transactions).

In certain circumstances, including any case where the transaction "could result in the control of any person engaged in interstate commerce in the United States by a foreign government or an entity controlled by or acting on behalf of a foreign government," CFIUS must "conduct an investigation of the effects of [the] transaction on the national security of the United States, and take any necessary actions in connection with the transaction to protect the national security of the United States."  50 U.S.C. App. § 2170(a)(3), (b)(1)(B), (b)(2)(A); Exec. Order No. 11858 § 6(b), *reprinted as amended in* 50 U.S.C. App. § 2170 app. at 824.  Where appropriate, CFIUS or, on its behalf, a "lead agency" designated by the Secretary of the Treasury (who is a member of CFIUS and serves as its chairperson) may "negotiate, enter into or impose, and enforce any agreement with any party to [a] covered transaction in order to mitigate any threat to the national security of the United States that arises as a result of the covered transaction."  50 U.S.C. App. § 2170(k)(2), (3), (5), (l); Exec. Order No. 11858 § 7(a)-(c), *reprinted as amended in* 50 U.S.C. App. § 2170 app. at 824.  In addition, the President has authority, following a CFIUS investigation, to "take such action for such time as the President considers appropriate to suspend or prohibit any covered transaction that threatens to impair the national security of the United States."  50 U.S.C. App. § 2170(d); Exec. Order No. 11858 § 6(c), *reprinted as amended in* 50 U.S.C. App. § 2170 app. at 824.

The Director of OSTP's participation in CFIUS could involve OSTP in the review and approval or disapproval of transactions involving "China or any Chinese-owned company." Continuing Appropriations Act § 1340(a).  Indeed, in particular cases, either as a CFIUS member or as the designated "lead agency," OSTP might be involved in negotiating, imposing, or enforcing agreements or other conditions that CFIUS deems necessary to protect U.S. national security with respect to such transactions.  But while such mitigation agreements may be a form of "contract," we do not understand them to fall within the scope of section 1340(a)'s funding restrictions.

By its plain terms, section 1340(a) restricts OSTP's use of funds only with respect to "a bilateral policy, program, order, or contract of any kind to participate, collaborate, or coordinate bilaterally in any way with China or any Chinese-owned company."  This language applies only to agreements between the United States and China or any Chinese-owned company that are both "bilateral" and in some sense cooperative. *See* 157 Cong. Rec. H2741 (daily ed. Apr. 14, 2011) (statement of Rep. Wolf) (describing provision as prohibiting OSTP "from participating in bilateral cooperation with China").  Mitigation agreements negotiated by CFIUS or a CFIUS lead agency are not bilateral cooperative undertakings, because they are negotiated to satisfy regulatory requirements imposed by the United States, through the CFIUS process, as a condition on a desired transaction.  Likewise, OSTP's other activities as a CFIUS member, as you have described them to us, involve review, investigation, and regulation of transactions involving foreign-controlled parties and thus would not involve OSTP in "develop[ing], design[ing], plan[ning], promulgat[ing], implement[ing], or execut[ing]" a bilateral cooperative undertaking covered by section 1340(a).  Accordingly, OSTP's CFIUS-related activities with

respect to transactions involving China or any Chinese-owned company are not restricted by section 1340(a).


/s/

VIRGINIA A. SEITZ
Assistant Attorney General